**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

————————————

No. 97-10808

————————————


PERRY LEE HAMMONDS,

Plaintiff-Appellant,

VERSUS

GLEN SMITH,

Defendant-Appellee.


————————————————

Appeal from the United States District Court
for the Northern District of Texas
(2:95-CV-269)

————————————————

April 6, 1999

Before REAVLEY, POLITZ, and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]


Perry Lee Hammonds, a Texas inmate, sued his warden, Glen Smith, under 42 U.S.C. § 1983 for Smith's purported deliberate indifference toward Hammonds's safety. We affirm the summary judgment entered in Smith's favor.


I.

Hammonds was an inmate serving time at the Coffield Unit of

_____

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

the Texas Department of Criminal Justice. Because of his assistance to the correctional officers in ferreting out illegal drug and alcohol use, Hammonds was transferred to the Clements facility for safety reasons on June 8, 1995.

Hammonds quickly began complaining of threats and attacks by other Clements Unit inmates. He told officials that several inmates from the Coffield Unit were being kept in the Clements Unit alongside him and that word had spread among the Clements inmates that he was a "snitch." He made several requests to be put into protective custody, transfer, or safekeeping.

Initially, Clements Unit officials told Hammonds to "tough it out," but after Hammonds had filed a formal emergency status grievance, he was interviewed by prison officials and put into temporary protective lockup on June 22, 1995. He provided officials with details regarding some of the alleged threats and assaults he had suffered, including the nicknames of his alleged assailants. Purportedly unable to substantiate Hammonds's allegations, prison officials returned Hammonds to the general prison population four days later.

After further claims of threats and assaults, Hammonds filed a second emergency status grievance on July 4, 1995, and was again placed in protective lockup on July 6. Following two investigations by two different prison officials, Hammonds was told that his complaint had been resolved and was led to believe that he was going to be kept in permanent safekeeping status. Still "scared and unsure," he filed a follow-up inquiry to his status on

2

July 30, to which he was told that he was "housed in transient status until the Bureau of Classification approves [his] transfer to another unit."

On August 7, a hearing was conducted into Hammonds's situation by the Unit Classification Committee ("UCC"). Again finding Hammonds's allegations unsubstantiated, the UCC recommended that he be returned to the general prison population; that occurred on August 14. Smith, a member of the UCC panel, claims that he is unable to recall the particular recommendation he made regarding Hammonds's status but has stated with certainty that he would have made a recommendation only if the other two panel members had disagreed with one another.

Hammonds asserts that, on returning to the general prison population, he again was assaulted. His request for help was answered by an ambiguous letter from Acting Warden Ellenberg.


II.

Hammonds sued on October 26, 1995. An evidentiary hearing was held on November 29 in which the district court ordered Hammonds to supplement his complaint and provide Clements Unit officials with additional information. Hammonds did so and was placed in temporary protective lockup immediately thereafter.

On December 14, a UCC hearing was held to look into Hammonds's protective classification. Smith was not a member of this UCC panel, however, and Ellenberg served in his place. The UCC recommended releasing Hammonds to the general prison population,

and he was so released on January 10, 1996. Immediately thereafter, he again began alleging a variety of assaults. On May 5, 1996, August 15, 1996, September 11, 1996, and March 11, 1997, Hammonds's situation was reviewed by the UCC, which each time declined to remove him from the general prison population.

Both sides moved for summary judgment. Hammonds contended that Smith had evinced deliberate indifference to his need for protection. Smith contends both that Hammonds failed to adduce any evidence of deliberate indifference and that Smith enjoys qualified immunity. Finding no issue of material fact regarding deliberate indifference, the district court granted summary judgment for Smith on this ground.

## III.

The issue is whether the summary judgment record can reasonably support a finding of deliberate indifference on the part of Smith toward Hammonds's safety. We review this matter *de novo* and apply FED. R. CIV. P. 56(c) in the same manner as did the district court. *See Melton v. Teachers Ins. & Annuity Ass'n of Am.*, 114 F.3d 557, 559 (5th Cir. 1997). Thus, we must affirm if there is no genuine issue of material fact and Smith is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

## A.

The Eighth Amendment's prohibition of cruel and unusual

4

punishment affords prisoners protection against injury at the hands of other inmates. *Farmer v.* Brennan, 511 U.S. 825, 832 (1994); *Johnston v. Lucas*, 786 F.2d 1254, 1259 (5th Cir. 1986). So, prison officials "have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (citation omitted). To the extent that prisoners suffer "sufficiently serious" harms, and to the extent that prison officials display deliberately indifference toward their well-being and safety, these officials can be held personally liable for violating constitutional rights. *Id.* at 828, 834. The state does not contest that Hammonds's alleged harms are "sufficiently serious," and so our inquiry is limited to examining the "deliberate indifference" requirement.

B.

As explained in *Farmer*, deliberate indifference "describes a state of mind more blameworthy than negligence" but less blameworthy than "acts or omissions for the very purpose of causing harm." *Id*. at 835. Deliberate indifference can most approximately be equated with "recklessness." *Id.* at 836.

> We hold . . . that a prison official cannot be found liable under the Eight Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* at 837.

5

C.

Although Hammonds points to evidence tending to show that Smith was "aware of facts from which the inference could be drawn that a substantial risk of serious harm [to Hammonds] exist[ed]," he did not put forth any evidence tending to show that Smith actually "[drew] the inference." Such subjective knowledge of risk is essential to hold a prison official liable under a theory of deliberate indifference. *See Farmer*, 511 U.S. at 837. In fact, the undisputed record strongly suggests that Smith, like the several other prison officials who handled Hammonds's case, not only took Hammonds's charges seriously, but also refused him protective custody only after investigation that convinced him of the untruthfulness of Hammonds's allegations.

Clements Unit officials, including Smith, reviewed Hammonds's complaints several times. The UCC convened on multiple occasions to investigate these matters and placed Hammonds into protective custody while at least two of these investigations proceeded. At the conclusion of each investigation, the UCC found Hammonds's allegations to be unsubstantiated. This included an investigation conducted by at least one UCC panel on which Smith did not serve. Medical examinations of Hammonds's injuries were likewise inconclusive, and Hammonds's answers to the UCC's questions were found to be vague and unhelpful.

Thus, at the end of each of its inquiries, the UCC concluded that Hammonds should not be afforded protective custody. Absent evidence of bad faith or malfeasance, which Hammonds has not

6

demonstrated, the only reasonable inference is that Smith properly discharged his duties as warden and at no time recklessly subjected Hammonds to substantial risk of harm. *A fortiori*, the district court was correct in finding no deliberate indifference as a matter of law.

## III.

Hammonds also challenges the denial of his FED. R. CIV. P. 59 motion, on the ground that Smith's purported failure to comply with the court's March 26, 1997, discovery order prejudiced him. Whether to grant a rule 59 motion is a matter within the discretion of the district court. *Martinez v. Johnson*, 104 F.3d 769, 771 (5th Cir. 1997). The court gave three reasons for denying rule 59 relief: (1) Incomplete disclosure did not prejudice Hammonds, because he already possessed copies (albeit unclear ones) of the documents he was requesting; (2) Hammonds had indicated in an exhibit to his May 16, 1997, motion for summary judgment that he had received the additional discovery in question; and (3) Hammonds waived his discovery objections by filing a response to Smith's motion for summary judgment that made no mention of the purported lack of discovery.

Hammonds has demonstrated that the district court most likely erred in coming to its second and third conclusions. Regarding the second, although the exhibit in question (exhibit "A") does mention that Hammonds had received some additional discovery, it goes on to explain (in the very next sentence) that the supplemental discovery

7

ordered on March 26 has not been completely provided.  Regarding the third, Hammonds did indeed reiterate his discovery concerns in his response to Smith's motion for summary judgment.  The court has apparently confused Hammonds's *response* to Smith's motion for summary judgment with Hammonds's *reply* to Smith's response to Hammonds's motion for summary judgment.  The latter document did not contain a reiteration of Hammonds's discovery concerns, nor did it need to.

Nonetheless, the district court's first finding§§that nonreceipt of the additional discovery could not prejudice Hammonds§§is a sufficient, independent ground for denying Hammonds's rule 59 motion.  The court found that Smith had produced the requested documents, and the March 26 order merely instructed him to produce a second set of the same because of certain illegible documents contained in the first.  The court also noted Smith's claim that the illegibility was not the result of reproduction, but rather inherent in the original documents.  The determination that any purported violation of the March 26 discovery order would not be prejudicial is a matter firmly within the court's discretion:  The decision regarded discovery and was made within the context of a rule 59 motion.

AFFIRMED.